Good morning your honors. May it please the court, my name is Tom Woodbury and I'm here today representing the Lands Council in this matter. Time permitting I would hope to address two issues for the court today. The first one being judicial deference and the second one reconciling the courts on bank decision in this case with the more recent opinion in Native Ecosystems Council v. Tidwell. On the issue of deference, this case actually has its genesis. I expect Judge Smith is having a great period of deja vu right now, so tell us what's new. We can't revisit what's old. I gather you're gonna make an argument. I recognize the name Lands Council. Well the arguments are all new from when the case was first brought up on appeal on a preliminary injunction. The arguments really aren't new. You're alleging facts that you believe, I gather, that were not presented in the first case, but it's the same arguments, are they not? You argued proxy on proxy before. You argued the argument of the old trees, etc. etc. etc. and the database. The arguments that were presented in the oral argument in the on-bank decision that you recognize were brought up for the first time. Some of those arguments... But they were brought up. Excuse me? They were brought up. You brought them up. They were, but the court did not have the advantage of the full evidentiary record before it on the evidentiary issues. Its standard of review is obviously deferential to the lower court. Now it's a de novo review on a complete record. So from a factual standpoint, the court needs to determine whether or not it can defer to the Forest Service's assertion that it has... Let me ask you this question, Mr. Woodbury. Take, for example, the issue of the old growth. Well let's go to the analysis of the forest inventory and analysis database. My understanding is that that information was produced well before the first litigation. Isn't that correct? The database itself. Wasn't that produced well before the first... We'll call it the first litigation. We'll call this the second litigation. Wasn't that in existence? Yes. Okay, so if you provide... When there's public comment and the Lands Council comes in with the Forest Service and it provides all this information, the Forest Service provides its information, it weighs what it's going to do, and there's a conflict. There always is in these cases. No matter what the Forest Service says, the Lands Council or Ecology System, or somebody else disagrees with it. They then, under Lands Council, analyze the materials. And if they disagree, or if they think what you've said is correct, then they try to correct their data. They go back and reanalyze it and so on. But when that's been done, the fact that there may be a disagreement at the end of the day doesn't mean that they can't go back and reanalyze the points that you make, why they find one way and you find a different way. Isn't that what Lands Council says? Lands Council v. Powell? No, Lands Council v. McNair, the en banc case. Lands Council v. McNair says that this Court's not going to question the Forest Service's science. I mean more than that. When you're dealing with conflicting data, what I'm seeing here is, basically, you're relitigating the same issue. You're saying, we didn't talk about this before. Yeah, we brought this up with the Forest Service. Yes, we talked about it, and we had this report, and they had that report, and they shouldn't have analyzed it this way. We've got some new data. We want you to consider it. Isn't that what we really have here? No. What have we got? No, we did litigate the TSMRS database before in Lands Council v. Powell. This Court found it was inadequate and specified the reasons. What this Court has to find in the record for this case is something, data, the hard data, that would justify reversing its findings in the previous Lands Council case, Lands Council v. Powell. The Forest Service says, we spent $320,000 updating the database. We say, well, great. How many of the 6,500 old growth stands did you revisit? They don't say in it. They don't say, oh, well, what did you do? We don't know. Well, where in the record is this updated database? Well, it's not there. Well, how is the Court supposed to defer to an assertion that spending $320,000 made all the problems with that database go away if there's nothing in the record that explains that? That's what this case is about. Then they say, well, forget about that. Even though that's always been our tool for demonstrating compliance with the 10% standard, let's forget about that because we have this FIA database that we're now going to rely on. We can't question the FIA database because that's science. We're not questioning the science of the FIA database, but we're saying, well, what does the FIA database purport to represent for the Court because that's what the Court needs to defer to? Well, according to the Forest Service, the old growth data in that database does not provide any information on block size, spatial relationships, or integrity of old growth habitat. What is integrity of old growth habitat? Quality. What has this Court said in the McNair case is the critical inquiry. Reliable information on the quantity and quality of old growth habitat. So how can the FIA database, which says nothing about the quality of old growth habitat, somehow validate the TSMRS database, which we know is not reliable on the quality or quantity of old growth? I think the problem that we have here, Mr. Woodbury, is that although you're using different nomenclature than you did in the first case, you're basically saying that the Forest Service, which of course is going to tell us that they totally disagree with your characterization of their findings and what is covered. But the reality is the Lance Counsel versus Powell dealt with a 15-year-old database. They spent $320,000 to update, review it, do field verification and so on to answer the concerns of Powell. You're saying, okay, they did that. We disagree with it still because of this and that. The Forest Service says, well, no, we did exactly what Powell told us to do and in light of the new standard in McNair, which complies with federal law, this is why we disagree. You disagree with that. I understand that. But doesn't that meet the requirement of McNair, the en banc case? And so the updated database says what about canopy closure exactly? It doesn't have to say anything about canopy closure. It doesn't have to. It doesn't say anything about anything other than we spent $300,000 and it's no longer 15 years old. What did they do? You say, oh, field verification and so forth and so forth. What does that mean? What is the methodology? Oh, they don't tell us. What did we find out from the 2003 monitoring report? Oh, it was a data review. What does that mean? Oh, well, we looked at the data. Oh, so now it's more reliable than it was 15 years ago when you actually went out in the field and looked at it without actually going out in the field and looked at it. Oh, but we looked at it in the project area with that new, you know, after updating that database, we went out in the project area and we did a very extensive review and looked at all the old growth stands. And guess what we found out? 22% inflation of old growth values. Very consistent with what we had before the court in Lands Council v. Powell. Very consistent with what we had before the Eastern District Court of Washington back in 2000. It was like 35% inflated. So what does the court have to defer to? A database that's no different than the previous database. The only thing, you know, what do we have? They're asking you to defer to unsupported contentions. And if that's what Lands Council v. Powell, I'm sorry, if that's what Lands Council v. McNair on banks stands for, then, you know, we never have any basis. The Forest Service might as well not produce an administrative record. They can just come into court and tell the court, we've looked at everything and we're satisfied, everything's okay now. Forget about those previous evidentiary findings. You don't need to actually look at the evidence. Okay, that's the problem that we have. I appreciate your passion, Mr. Woodbury. I really do. I respect you. I respect your organization. But the reality is you seem to be caught up in the problem that if somebody disagrees with you, they must be wrong. And that's not what the law is. No, the reality is we're dealing with a Forest Service that has basically no longer complying with the law. It's logged so much over the last three decades, including 32 timber sales in this area that is so deficient of timber harvest, apparently, that they're no longer able to find a single indicator species in the project area, which the indicator species they're using to justify logging that species. I have kind of a pragmatic question about just the facts here. You have positions you're pressing great. Here's a thinning sale over a couple hundred acres where no big trees are being cut. Why would you choose this one? Why would you choose these facts? Why wouldn't you find some facts that would help you? Because we're not concerned with old-growth trees, Your Honor. We're concerned with old-growth habitat. Just as the Forest Service experts and scientists were when they formulated this forest plan. An old-growth stand with old-growth trees and no undergrowth is a park, okay? That's not old-growth habitat. That's not what species rely on. And the Forest Service, and we pointed out in the record, is very clear about what quality of old-growth habitat means. It doesn't mean just big trees. And the science they rely on, the regional standards, all they say is that if you have this many large trees per acre in this basal area or whatever, it meets the minimum criteria to qualify potentially for old-growth habitat. It doesn't mean that it's old-growth habitat. But you're just disagreeing with the Forest Service. You're saying that you've got to leave everything that's down there. You can't thin it. You can't trim it for infestation of bugs and so on. You can't do it for fires. Because from your perspective, anything that changes is just wrong. And it doesn't matter what the regulations say. And it doesn't matter what the ongoing cases say. No, that's not true, Your Honor. We're forced to argue that because they don't monitor species habitat. I mean, they don't monitor species populations. And what we're arguing is basically the same argument this Court had before in Native Ecosystems Council versus Tidwell. We're arguing over species that no longer exist in the project area. But, Mr. Woodbury, you're saying that they don't monitor them. How can you say that? Because. Okay, don't take my word for it, Your Honor. The same judge that decided this case has just recently, in the last two months, decided another case on the same forest with the same issues and the same old-growth habitat. The only difference between that decision and this decision is that that court, the lower court, had the advantage of this court's decision in Native Ecosystems Council versus Tidwell. And it went through this analysis, a very detailed analysis, reconciling the on-bank decision in this case with the decision in NEC versus Tidwell. And it found exactly that everything that I'm telling you today is correct, that they are no longer ensuring the viability of old-growth species, the proxy on proxy methodology has failed, and that without finding any flammulated owls in the project area, the Forest Service cannot conclude that they're ensuring the viability of flammulated owls. You're suggesting that we need to decide this case based upon what the district courts decided in another case. No, I'm telling you that I only have a minute and 51 seconds left. And that shorthand is that if you examine the lower court's analysis in Lands Council v. Cottrell, 2010 Westlaw 316-8375, they deal with all of these issues in depth, they reconcile your on-bank decision in this case with the more recent opinion in Native Ecosystems Council v. Tidwell, and they come to the exact same conclusions that we're asking the court to adopt today. We'll look forward to seeing that decision from the lower court. But let me just ask you this. Has the Lands Council ever agreed with the proposed thinning of old-growth forest anywhere? The Lands Council works with forests all the time. What example can you give me? I don't work for the Lands Council. There isn't any, is there? All I'm saying is that I know that they work with the forest. You are adamantly opposed. They challenge every logging project that involves old-growth or older forests, and I'm telling you absolutely that is not the case. Most of the times they have objections. They work those out through administrative processes. Most of the time the Forest Service actually even addresses the science that they raise and the concerns that they raise, unlike in this case. They're saying they oppose them, but they work them out. I'm saying that they don't litigate every case. I understand that, but the reality is everything the Forest Service ever proposes, you are opposed to it. You try to work it out, but you oppose it all. You're raising political issues, Your Honor, and I'm asking you to apply the law. No, that's what we're doing here. We're talking about the law. Lands Council's basically political opinions on old-growth logging, you're saying, is what's going to determine the outcome of this case. How is that relevant? That's no more relevant than your political ideology is on old-growth logging or timber harvest. We're asking you to apply the law from Idaho's Board in Congress versus Thomas, that they have to have the hard data and the record to support their conclusions, from Lands Council v. Powell, which is that TSMRS database is not reliable, and from NEC v. Tidwell, which says if you have evidence in the record for a 10-year period of time, when they've been logging this area repeatedly, including the stands we're trying to protect, to supposedly benefit flammulated owl, but they can't find any flammulated owls when they put recorders out in the forest and when they do call-and-response during mating season, basically over a 10-year period, there's no flammulated owls, then they can't say that that's our indicator species and that's how come we know everything is okay with dry-site old-growth species. Thank you, Counselor. You're over your time. Good morning, and may it please the Court. My name is Brian Toth from the Department of Justice, representing the – from the Department of Justice, representing the Forest Service, and Renata McNair, who's the President of the Courtroom. With me at the Council table is Scott Horngren, Counsel for Intervenor Appellees. I intend to speak for 12 minutes and reserve three minutes for Mr. Horngren. You can adjust that podium, too, if you want. There's a switch, if you want to bring it down a bit. If it's distracting you all. No, no, it's not. I just want to make sure you're comfortable. Thank you, Your Honors. Approximately two years ago, in the summer of 2008, this Court sat en banc in this very same case and upheld the District Court's conclusion that the plaintiffs were not likely to succeed on the merits of their claims. Although we now have a final judgment, nothing has really changed here. The Court had available to it in the en banc case the full administrative record. It was one of those situations, when appealing from a preliminary injunction order, that the Forest Service had managed to lodge the complete administrative record with the Court. There has not been any supplementation of the administrative record and no other new evidentiary supplementation of the District Court's record, only newly packaged legal arguments. And there has not been any meaningful change in the relevant case law that should cause this Court to reach a different conclusion here. I do want to provide a little bit of perspective on this project. I realize the Court may be familiar with it already, so feel free to interrupt if I'm speaking too much about this. But the Service decided this action was necessary to maintain and enhance old growth and other parts of the forested landscape to trend them more toward their historic condition, which in many situations is drier forest dominated by ponderosa pine that's more open. What's happened on this forest is that due to fire suppression policies, the understory has built up to such a degree that if they were to try and control through low intensity burns like occurred historically, it would develop either into a catastrophic fire and kill all the old growth, or if it didn't develop into a crown fire, it would scorch the roots so much that that would also harm the old growth. So really the goal of this project is to bring the forest more toward its historic conditions. According to Forest Service modeling, the selected alternative would likely reduce the risk of stand replacing fire by about 20% in the project area and 50% within the treated areas. If the Forest Service, by contrast, takes no action, the old growth is expected to drop from 11% to 3%. The younger forests are expected to increase from 28% to 82%. So in the backdrop of all of this, the Service decided that it would select this project to trend the forest toward a more historic condition. And that's what the lower court examined that we decided en banc, right? Based on those facts? Correct. And those are facts drawn from the EIS and the record position that's in the record. Right. What has changed, if anything, since the en banc case with regard to the matters that Mr. Woodbury has brought up? I'm not sure I understand whether he's saying that, yeah, we told you about this before but there were some things that you didn't know about, such as the database issue, for example, or that the Service has made some changes and they're not enough because they didn't address everything we wanted. Would you address that? What, if anything, has the Forest Service not done that the law required? I don't believe it hasn't done anything that the law has required. I think it's the same, essentially the same facts. They're coming to poke holes in the timber stand inventory database and argue that it wasn't enough just to update the database after lands council against how in the project area, that we have to somehow prove that throughout the entire forest the database has been updated. Didn't the en banc case, though, approve that very report? Yes. At the time the district court decided it, we concurred the district court was accurate on that. Is that the law of the case as far as that issue is concerned? I don't think any facts have changed as far as whether you're technically bound to follow it because it was a decision on a preliminary injunction appeal. Technically the conclusions of law and findings of fact are binding on this panel. But I submit that nothing has meaningfully changed in the factual record. So how do you deal with Tidwell? Tidwell is really peculiar to its facts. In fact, well, first of all, we have an MIS rather than a sensitive species like the flame-related owl. There are different regulatory regimes for each species. Second, the MIS issue in that case, there was evidence of downward population trends occurring for the prior decade. That's not the case here. If you look at the Samson paper in the record, it shows that for several of these bird species, there's no evidence of population declines in the northern region, the Forest Service. There are other bases as well. In fact, Tidwell expressly distinguished this court's oddball decision in this case on the grounds that the Forest Service had difficulty monitoring the flame-related owl here. There were nesting boxes that didn't show the presence of owls, and it was unclear from the record whether the nesting boxes had been placed at the proper height. So Tidwell distinguished cases such as this one where there were monitoring difficulties. There are other factors, too, that can distinguish Tidwell. Several of these species, the fisher and the marten, are rare and unlikely to be found through routine surveys. So there are a variety of grounds that make Tidwell peculiar to its facts. So you're just distinguishing it based on its facts? Well, we disagree with the law, too, but this court denied our petition for re-hearing on Bonkin in the case. So we're left with the law as it is, and I'm taking that in mind. Do we have some time for your interveners? Yes, unless the court has any further questions. I think not. Okay, thank you. Mr. Horngren. Thank you, Your Honors. Scott Horngren on behalf of the Intervenor Boundary County, and Commissioner Dan Denning is here with me in the courtroom coming from Idaho this morning at 3 a.m. I'm familiar with the commute. I think what has changed as you evaluate this case now on summary judgment compared to what we had before on the en banc review was there was argument earlier today in one of the cases about having the whole panel of judges review this, and Judge Smith along with ten of his best friends unanimously sorted through this wildlife viability issue, and that's in part what we're talking about and also the old growth issue. And relying and starting with motor vehicles manufacturers, they said that the Forest Service can't rely on factors that Congress didn't intend the agency to consider, entirely failed to consider an important aspect of the problem, or offers an explanation that runs counter to the evidence or is so implausible that it could not be ascribed to a difference in viewer or product agency expertise. Pretty much standard APA review law. But then what the court did is they took that fundamental arbitrary and capricious deference and they applied it to this wildlife viability issue that Mr. Woodbury is admittedly rightfully excited about. And they said the way you show that you meet that APA standard is you link habitat to the species needs in this viability analysis, you use all the scientific information that's available to you, and you use methods of measuring habitat that are reasonable and reliable, and will defer to the Forest Service about what evidence is or isn't needed to support a wildlife viability analysis. So those things capsulize the APA review standard here for wildlife viability and old growth. So let's look at old growth quality. Arguably it's new in terms of their argument, but the facts are the same in terms of, gee, we don't think that your assessment of old growth is accurate because when you look at the project area you find 20% less old growth. The methods you're using are ignoring, consistent with the APA, snags and canopy closure. But the way the Forest Service explains it is they say, look, we are spending all that $320,000 not only doing inventories in the project area but throughout the forest. And in the project area we are going to take the best stuff we have and we're going to use that and reserve that now for old growth, this category 11 old growth. And then in terms of the snags and the canopy closure that aren't part of this timber stand management record system, the Forest Service explains in the environmental documents and says we're going to use this green publication definition of old growth and snags and canopy closure are associated characteristics, but what the key provisions of old growth are are how old the stand is, what the diameter of the trees is, how big they are, and how many, the number of trees that exceed that diameter that are over 21 inches, and the basal area which is a measure of stand density. And that's what we're going to use and that's green. And in Wild West Institute versus Bull, Mr. Woodbury and his client at 547 Fed 3rd 1171 said that green definition of old growth he agreed with. And so the Forest Service is using that here. But you still need to look at this, did they ignore the snags, the standing dead trees? No they didn't. They went on to look at the best information available about snags, which was publications by Evelyn Bull suggesting that four to six snags per acre are necessary for wildlife. And that's what they saved in the project even though their plan suggested 1.3 snags per acre was sufficient. And so the bottom line here is plaintiffs are concerned about the quality of old growth and that the Forest Service ignored the quality. When in fact the green definition does address the attributes of quality in a number of ways and then they go beyond that to fill in the gaps on the snags. And in terms of the canopy closure, they rely on this basal area rather than canopy closure because it's more a measurement of the density of stands. So you could have a five-year-old stand that was 100% canopy closure but wouldn't provide any old growth at all. So to sum up, they are, as the Lands Council En Banc panel described, technical considerations that the Forest Service needs to make. And it isn't for this court to legislate nor is it for this court to second-guess the Forest Service in their scientific judgments, and we'd urge you to affirm. Thank you. Thank you, counsel. Give you two minutes for rebuttal. Okay. The main limitation of the FIA database is that we're talking about basically data from eight one-acre plots in the Panhandle National Forest. And the forest plan, in this case, is very clear, as was the EIS supporting the forest plan, that if a stand is under 25 acres, it can't be considered to be old growth habitat. So the FIA database basically counts everything, regardless of fragmentation, roads, clear cuts, whatever. So this is like the most critical concern that we have throughout all of this litigation and has yet to be addressed. It's an important factor that has not been addressed. And the fact of the matter is that even in the discussion of the 25-acre minimum, which was based on goshawk habitat needs for their nesting habitat, the Forest Service experts recognize that really a minimum of 80 acres would provide for the habitat needs of most old growth species. You made all these points known to the Forest Service, did you not? Yes, and they didn't address them. Okay. Under lands council, are they required to address everything you raise or just the ones? The points that we raise on the minimum habitat needs of old growth species, which are, they're experts, not our experts, okay? And the point about the best available science, which this court also, this court was applying the 2008 planning rules that have been invalidated, so we're back to the best available science standard. The best available science, which we asked the Forest Service to respond to, says that this 10% standard that we're arguing over is going to result in the extirpation of some old growth species, that it's outside of the historic range of variability which these species evolved on. This is a critical factor that goes right to the heart of the core assumptions of this strategy. And the Forest Service's response to that was we're not going to consider that because we made that decision back in 1980-whatever when we adopted the forest plan. But the law says you have to apply your forest plan, and when implementing it at a project-specific basis, you have to consider the best available science. The best available science in this case undermines the core assumptions, and so under Center for Biological Diversity case, they have to address that in the EIS. And the other main factor that is critical is the fall-down factor. Why are we arguing over 10.7% old growth in the forest? We know from every time they do one of these project-level analyses that that level is inflated, that that counts too much old growth forest. And why do they not address the issue of applying a fall-down factor? Because they know if they did that they would be below 10.7% forest-wide, which means they would not be ensuring viability of old growth species in the forest, which is exactly why they're not finding flammated owls in a project area of this size when that's the management indicator species that they're supposedly trying to benefit. Thank you, Counselor. The case has probably been submitted. I want to thank all of you who came so far to attend the argument. It's an important issue. All of these are important issues for this area of the country. So thank you very much. Thank you.
judges: Hogan, Thomas, Smith M.